[Cite as *State v. Shaw*, 2013-Ohio-5292.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.   12 MA 95 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| MELVIN SHAW, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeal from Common Pleas
                               Court, Case No. 10CR754.

JUDGMENT:                      Affirmed in part; Reversed and
                               Remanded in Part.


APPEARANCES:
For Plaintiff-Appellee:        Attorney Paul Gains
                               Prosecuting Attorney
                               Attorney Ralph Rivera
                               Assistant Prosecuting Attorney
                               21 West Boardman Street, 6th Floor
                               Youngstown, Ohio  44503

For Defendant-Appellant:       Attorney J. Gerald Ingram
                               7330 Market Street
                               Youngstown, Ohio  44512

JUDGES:
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

                               Dated:  October 31, 2013

VUKOVICH, J.

{¶1} Defendant-appellant Melvin Shaw appeals from his conviction and sentence entered in the Mahoning County Common Pleas Court for aggravated murder, attempted murder, felonious assault and improper discharge of a firearm into a habitation. Multiple issues are raised in the appeal. In the first two issues, appellant asserts that the trial court improperly allowed hearsay testimony. Under the third issue, appellant argues that the photographic lineup was unduly suggestive and resulted in an unreliable identification. The fourth issue is whether trial counsel was ineffective by failing to stipulate to the admissibility of the victim's cell phone records. The fifth issue is whether, for purposes of sentencing, the trial court erred when it failed to merge the felonious assault convictions with the attempted murder conviction. The sixth and final issue is whether the jury verdict form was incorrect and amounted to prejudicial error.

{¶2} The only issue raised that has merit is the fifth issue. We find that the trial court erred when it failed to merge the felonious assault convictions with each other and with the attempted murder conviction. All other arguments raised are meritless. Thus, the convictions are affirmed, the trial court's decision to not merge the felonious assault convictions with each other and the attempted murder conviction is reversed and the matter is remanded for resentencing. On remand, the state retains the right to elect which crime it seeks to pursue on resentencing. *State v. Whitfield,* 124 Ohio St.3d 319, 2010–Ohio–2, 922 N.E.2d 182, ¶ 25.

Statement of the Facts and Case

{¶3} In the early morning hours of June 19, 2010, multiple shots were fired into the residence at 63 Manchester Avenue, Youngstown, Ohio. Inside the residence were Tracee Banks and Jamel Turner. Each was shot multiple times. Tracee died as a result of the shots, however, Turner was severely injured and survived.

{¶4} Following an investigation, appellant was indicted for the crimes that occurred on June 19, 2010. He was charged with the aggravated murder of Tracee Banks, in violation of R.C. 2903.01(A)(F); for the attempted murder of Jamel Turner,

in violation of R.C. 2903.02(A)(D) and R.C. 2923.02(A), a first-degree felony; for the felonious assault of Jamel Turner, in violation of R.C. 2903.11(A)(1)(D), a second-degree felony; for the felonious assault of Jamel Turner, in violation of R.C. 2903.11(A)(2)(D), a second-degree felony; and improper discharge of a firearm into a habitation, in violation of R.C 2923.161(A)(1)(C), a second-degree felony. Each indicted offense was also accompanied by a firearm specification as defined in R.C. 2941.145(A).

{¶5} Following discovery and pretrial motions, a jury trial was held and the following evidence was introduced. Tracee was 17 years old at the time of her murder and appellant was her boyfriend. They had been together for months. However, their relationship was characterized as volatile and rocky; they broke up and got back together multiple times. Tr. 271. On June 18, 2010, Tracee was babysitting her cousin, Sierra Smith's, daughter, Sieagia, and Tracee's nephews, Jazz and Benjamin. Tr. 317-320. Tracee tweeted she was having a wonderful day. Tr. 318. Tracee and appellant dropped the kids off in the afternoon at Sierra's house located at 63 Manchester in Youngstown, Ohio. Tracee did not go into the house, which Sierra thought was odd since Tracee was going to be babysitting her daughter later that evening. Later, around six in the evening, appellant dropped Tracee off at Sierra's house; Tracee came into the house crying. Tr. 321.

{¶6} Sierra went to work around 6:45 p.m. She received a text from appellant around 8:00 p.m. asking where she was at. She responded that she was at work.

{¶7} Sometime later that evening, Turner visited Tracee at Sierra's house to talk about some personal issues she was having with her relationship with appellant. Tr. 566-568. Tracee and Turner were friends. Turner testified that Tracee received two calls from appellant that evening. He claimed she also received a text message, got up looked out the window, and said "I think Melvin is here." Tr. 576-579. Turner got up, looked out the window, and presumed that the person he saw was appellant; Turner had never met appellant before. Tr. 567, 579. Turner then told Tracee that they should sit down on the couch, which they did. About 30 seconds later shots

were fired. Tr. 581. Turner was hit in the throat and leg. Tracee ran in front of him and she was shot multiple times.

{¶8} At trial, Turner testified and identified appellant as the perpetrator of the crime. Through testimony it was also revealed that about a month after the crimes, Turner identified appellant in a photographic lineup as the perpetrator of the offenses. Prior to trial, defense counsel tried to suppress that identification. However, the trial court denied that decision.

{¶9} Detective Patton, from the Youngstown Police Department, investigated the shooting at 63 Manchester Avenue. He testified that upon arriving at the scene he saw Turner on the floor, going in and out of consciousness. He also saw Tracee lying on the floor and next to her was a cell phone. He saw two text messages on the cell phone. One message was sent at 12:44 and asked "Are we still going together?" The other message was sent at 12:33 and stated "I hate you." Tr. 473. These messages were sent from appellant's cell phone. Tr. 473.

{¶10} It was explained at trial that pictures of these text messages were unable to be taken because these messages accidently got erased. The phone was turned off after Detective Patton viewed the messages. The next day when the phone was turned back on, the old text messages were erased, which included the above two text messages. Detective Patton was able to get the cell phone records for Tracee's phone, however, these records did not contain the text messages received. Detective Patton attempted to get the cell phone records for appellant's cell phone, but was unable to. Tr. 483.

{¶11} Detective Patton testified that appellant was brought in for questioning in the early morning hours of June 19, 2010. The video of the questioning was played for the jury. During that interview, appellant denied having anything to do with the shooting. When questioned about the texts, appellant admitted to sending the text message asking Tracee if they were still "going together." However, he denied the "I hate you" text. A gunshot residue test was also performed on appellant at that time. Appellant denied using a gun recently; however, the result of the gunshot residue test was that the particles found on appellant were highly indicative of

gunshot primer residue. Tr. 356. Appellant did not testify at trial, but his statement and the gunshot residue test results were admitted at trial.

{¶12} Detective Patton also testified that the police attempted to question Turner at the hospital, but was unable to due to his injuries. A gunshot residue test, however, was performed on him. The test revealed that the particles found on him were highly indicative of gunshot primer residue.

{¶13} After viewing the above evidence, the jury found appellant guilty of all offenses and accompanying gun specifications. Sentencing was held at a later date. For the aggravated murder conviction, appellant was sentenced to life with parole after thirty years and three years for the accompanying firearm specification. Those sentences were ordered to be served consecutive to each other. For count two, the attempted murder of Turner, appellant received a ten year sentence and three years for the accompanying firearm specification. Those sentences were ordered consecutive to each other and consecutive to the aggravated murder and accompanying gun specification sentence. For count three, felonious assault of Turner, appellant was sentenced to eight years and received three years for the firearm specification. The eight year sentence was ordered to be run consecutive to the sentences received on counts one and two. The three year sentence for the accompanying firearm specification was merged with the firearm specifications in counts one and two. For count four, felonious assault of Turner, appellant received an eight year sentence, which was ordered to be served concurrently with count three. The accompanying firearm specification merged with the firearm specification in count three. On count five, improper discharge of a firearm into a habitation, appellant was sentenced to an eight year sentence to run consecutive to the sentences imposed on counts one, two, three and four. The trial court issued a three year sentence on the accompanying firearm specification but merged it with the firearm specification in counts one, two, three, and four.

{¶14} Appellant appeals from his conviction and sentence.

<u>First Assignment of Error</u>

{¶15} "The trial court erred when it admitted the hearsay statements of Tracee Banks through the testimony of the witness Jamel Turner."

{¶16} Appellant contends that four statements made by Turner were hearsay and were improperly allowed over defense counsel's objections. The first is that Turner testified that Tracee told him she was having some personal issues with appellant. Tr. 566-568. Second, Turner further testified that Tracee's phone rang and she went upstairs. After she retuned downstairs to where Turner was sitting on the couch, she told him that she had been talking to appellant on the phone. Tr. 573-574. Third, he indicated that during a second conversation on the phone, she said, "I am where I been at all day, Melvin." Tr. 589. Thus, he concluded that she was again talking to appellant Melvin Shaw. Lastly, Turner testified that Tracee said, "I think Melvin is here" and "Melvin is here" moments before the shooting started. Tr. 579-580.

{¶17} The state discusses at length whether the statements violate the Confrontation Clause of the United States Constitution. However, appellant did not present a Confrontation Clause argument; appellant concedes that the statements do not violate the Confrontation Clause. Therefore, the Confrontation Clause argument will not be addressed.

{¶18} As stated above, appellant contends that the above statements are hearsay and are inadmissible. We review questions of admissibility of evidence under an abuse of discretion standard of review; as such, we will not disturb the trial court's ruling absent an abuse of discretion. *State v. Collins*, 7th Dist. No. 10CO11, 2011-Ohio-6365, ¶ 73, citing *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985). An abuse of discretion connotes more than an error of judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶19} "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Evid.R. 802 contains the general prohibition against the admission of hearsay. However, exceptions to this general prohibition are enumerated in Evid.R. 803.

{¶20} The state concedes that all of the statements made by Turner are hearsay. That concession is correct. The statements were not made by Turner, they

were made by Tracee. Furthermore, they were offered to prove the truth of the matter asserted. For instance, Turner's testimony that Tracee said, "I think Melvin is here" and "Melvin is here" was offered to prove that appellant was there. The statements that Tracee made to Turner about having personal problems with appellant were offered to show that Tracee and appellant had been fighting. The statement that Tracee told Turner she had been talking to appellant on the phone and Turner hearing her say on the phone "I am where I been at all day, Melvin", were offered to prove she was on the phone with appellant prior to the shooting.

{¶21} Although the state concedes that the statements are hearsay, it contends that they are still admissible under the exceptions to hearsay that are set forth in Evid.R. 803. Specifically, the state asserts that the statements qualify as either present sense impressions or excited utterances.

{¶22} The analysis starts with the state's position that the statements were admissible as excited utterances. Excited utterance is defined in Evid.R. 803(2) as, "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

{¶23} There is no indication that the statements were made relating to a startling event while Tracee was under the stress of excitement caused by the event. At the time Tracee made the statements, the shooting had not yet occurred. Therefore, the shooting cannot be considered the startling event. Furthermore, while there may be an indication that Tracee was having personal issues with Shaw, Turner testified that she was relaxed. Tr. 578. He did not once testify that she was upset or under stress. Consequently, without more in the record, it is difficult to find that the excited utterance exception applies to this case.

{¶24} The state also claims that the statements fall under the present sense impression exception. A present sense impression is defined in Evid.R. 803(1) as, "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." "The principle underlying this exception is the assumption that statements or perceptions, describing the event and uttered in close temporal proximity to the event, bear a high degree of

trustworthiness." *Cox v. Machinery Co.,* 41 Ohio App.3d 28, 35 (12th Dist.1987). "The key to the statement's trustworthiness is the spontaneity of the statement, either contemporaneous with the event or immediately thereafter." *Id.* Therefore, temporal proximity is critical to a present sense impression analysis. That said, there is no bright line rule as to what amount of elapsed time precludes a finding that the exception applies. *State v. May*, 3d Dist. No. 8-11-19, 2012-Ohio-5128, ¶ 42.

{¶25} The most damaging testimony for appellant was Turner's testimony that Tracee said "Melvin is here" and "I think Melvin is here." These statements are the most damaging because it puts appellant at the scene of the crime moments before the shooting started. Appellant contends that this statement is not a present sense impression because it was not based upon her viewing or identification of the defendant, but merely a verbalization of her thought process after receiving a text message.

{¶26} Based on Turner's testimony we disagree. The testimony is as follows:

Q. Is there another point in time that she gets up?

A. Yes, there is.

Q. What is that in response to?

A. I believe it was a text message.

Q. Okay. And why do you believe it was a text message?

A. Because she looked at her phone and then she got up.

Q. Okay. What did she do when she got up?

A. She looked out the window again.

* * *

Q. And what did she say at that point?

* * *

A. I asked her what she was doing. She turned around, I think Melvin is here.

Q. What did you do in response to that?

A. I got up and went and looked out the window.

Q. What did you see?

A. I seen Melvin coming up the steps.

* * *

A. I figured that because she said Melvin is here.

Tr. 578-580.

**{¶27}** This testimony shows that Tracee's statement that Melvin is here is a present sense impression since she said it after receiving a text and looking out the window; it is a statement describing an event while Tracee was perceiving the event. Furthermore, it has a degree of trustworthiness since the statement was made immediately after looking out the window, i.e. after she saw what was outside.

**{¶28}** Despite the close proximity in time, appellant claims that the statements are untrustworthy because the cell phone records of Tracee are inconsistent with the testimony of Turner regarding the phone calls and text message.

**{¶29}** We find no merit with this argument. First, the cell phone records, although introduced at trial, were not admitted into evidence. Second, Turner does not state what the text message said or clearly indicates that she received a text message. As the above testimony shows, he assumed she received a text message because she looked at her phone. Her statement that "I think Melvin is here" and "Melvin is here" came after she looked out the window. Thus, the testimony is not dependent upon phone records. Regardless, Turner's testimony does not include a time for when the text was received. All that can be derived from his testimony is that Tracee may have received a text shortly before the shooting.

**{¶30}** In conclusion, given the testimony, the statement "Melvin is here" and "I think Melvin is here" were present sense impressions and the trial court did not abuse its discretion in allowing the testimony.

**{¶31}** As explained above, the other three complained of statements are used to show that Tracee and appellant were fighting and were communicating with each other that evening. We do not need to reach a determination of whether these statements qualify as present sense impressions because even if they were impermissible hearsay they at most amounted to harmless error.

**{¶32}** Tracee telling Turner that she was having relationship issues with appellant was used to show that status of Tracee and appellant's relationship. Testimony from other individuals already established that Tracee and appellant had a

rocky relationship. Tracee's mother testified that the relationship was volatile. Tracee's cousin, Sierra, testified that when Tracee was dropped off at her house by appellant she got out of the car crying. Thus, Turner's testimony about what Tracee said about the relationship is merely cumulative and harmless.

**{¶33}** The other two statements are that after the first phone call Tracee said that was appellant on the phone and that during a second phone call, Tracee said "I am where I been at all day, Melvin." These statements were offered to show that Tracee had been talking to appellant prior to the shooting and insinuates that he is the shooter. These statements also amount to harmless error because there was other evidence to these matters. In regard to appellant being the shooter there was Tracee's statement that "Melvin is here" after looking out the window, Turner's act of looking out the window and seeing someone who he presumed was Melvin Shaw walking up the steps of the house, the shooting occurring shortly thereafter, and Turner identifying appellant as the shooter. Also, gunshot residue was found on appellant's hands. Thus, even if the statements were inadmissible hearsay they are cumulative of properly admitted evidence and thus, amount to harmless error.

**{¶34}** In conclusion, this assignment of error lacks merit.

<u>Second Assignment of Error</u>

**{¶35}** "The trial court erred when it admitted the hearsay testimony of Detective Patton regarding text messages which were never authenticated."

**{¶36}** The testimony at issue in this assignment of error comes from Detective Patton and concerns text messages on Tracee's cell phone:

> Q. By the victim there is a cell phone.
> A. Correct.
> Q. Did you have that collected?
> A. Yes.
> Q. Were you able to view that phone.
> A. Yes.
> Q. And what did you view?
> A. There was a couple text messages from the phone?
> Q. Okay.

A. One of them said that, "Are we still going together?" And the other one said, "I hate you."

Q. Could you tell what time those were at or what phone number they were from?

A. Yes. The times were 12:33 and 12:44, and the phone number – I have to look at my notes to give you the exact number – was (404) 324-9286.

Q. Was there any name attached to that phone number that was on the phone?

A. I don't remember.

* * *

Q. Okay. When you're looking at these texts on the phone, do you know which one came in at what time?

A. Yes. The one at 12:33 was "I hate you". And the one at 12:44 was "Are we still going together."

Q. And they are both from the same number?

A. Both from that same number.

Tr. 473-474.

**{¶37}** Appellant was questioned regarding the crimes. During that questioning he admitted that his phone number was (404) 324-9286 and that he sent the text asking if they were still going together. However, he denied ever sending the "I hate you" text.

**{¶38}** At trial, appellant's cell phone records were not admitted. Rather, Detective Patton testified to the contents of two text messages that he saw on Tracee's phone. Appellant contends that Detective Patton's testimony regarding that "I hate you" text not only violates the Confrontation Clause, but is inadmissible as hearsay.

**{¶39}** The Confrontation Clause in the United States Constitution preserves the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Constitution, Sixth Amendment. The United States Supreme Court has explained that the Confrontation Clause bars "admission of testimonial statements of

a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354 (2004). The key issue is what constitutes a testimonial statement: "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006).

**{¶40}** Appellant's contention that Detective Patton's testimony violates the Confrontation Clause is based on the Ohio Supreme Court's decision in *State v. Hood,* 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057. In *Hood,* the cell phone records from Hood and his co-conspirators were admitted into evidence. The records were used to show Hood was in the vicinity of the crimes and showed communication between the conspirators. Id. at ¶ 5, 47, 49. The records, however, were not authenticated as business records and, as such, it could not be concluded that they were nontestimonial in nature. *Id.* at ¶ 42. Accordingly, the Court held that it was constitutional error to admit the records. *Id.* The Court additionally noted that if the cell phone records had been authenticated then they would be nontestimonial in nature and thus, would not violate the Confrontation Clause. *Id.*

**{¶41}** For purposes of a hearsay analysis, appellant is attempting to exclude his alleged own statement. Evid.R. 801(D)(2)(a) deals with admissions by party-opponents and provides:

> **(D) Statements which are not hearsay.** A statement is not hearsay if:
>
> * * *
>
> (2) *Admission by party-opponent.* The statement is offered against a party and is (a) the party's own statement, in either an individual or a representative capacity * * * .

Evid.R. 801.

**{¶42}** The Eighth Appellate District has previously determined that photographs of text messages that the defendant sent from his cell phone were not hearsay pursuant to Evid.R. 801(D)(2), rather, they are the party's own statements if

the statements were properly authenticated. *State v. Roseberry*, 197 Ohio App. 3d 256, 2011-Ohio-5921, 967 N.E.2d 233, ¶ 73. The *Roseberry* court noted that in cases involving electronic print media, i.e., texts, instant messaging, and e-mails, the photographs taken of the print media or the printouts of those conversations are typically authenticated, introduced, and received into evidence through the testimony of the recipient of the messages. *Id.* at ¶ 75. In *Roseberry*, the appellate court found that certain photographs of text messages were admissible because the recipient of the message, which in that case was the victim, testified. However, other messages that the recipient of the message did not testify about were inadmissible. The court explained:

> However, the content of the text messages contained in other exhibits 11 through 14 are hearsay because they contain out-of-court statements used to prove the truth of the matter asserted, specifically that Roseberry had committed the acts of breaking and entering and theft. Unlike the photographs that contained the content that Adams [the victim and recipient of the text messages] had previously testified to, Detective Delisle did not have knowledge of the content of the text messages. He did not testify that he knew Roseberry's cell phone or that he could determine from the cell phone which messages were sent or received and by whom. The only method of identifying the "speakers" and deciphering the content of those text messages was through what Adams told Detective Delisle because nothing within the text messages independently indicated the senders or speakers of the text messages. Therefore, the hearsay exception under Evid.R. 801(D)(2)(a) cannot be used for these exhibits to be received into evidence. Accordingly, we find that the trial court abused its discretion in receiving these photographs of the text messages, state's exhibits 11 through 14, into evidence through Detective Delisle's testimony alone.

*Id.* at ¶ 74.

{¶43} Accordingly, photographs of the text messages can be admissible as an admission by a party-opponent under Evid.R. 801(D)(2)(a) if they are properly

authenticated. *Id.* at ¶ 73-75. *See also State v. Thompson*, 777 N.W.2d 617, ¶ 31 (N.D. 2010) (subject to proper foundation, text messages sent from defendant's phone represent her statements under North Dakota Evidence Rule 801(d)(2)(i), which is identical to Ohio Evidence Rule 801(D)(2)(a)); *State v. Espiritu*, 117 Haw. 127, 132-33, 176 P.3d 885 (2008) (text messages themselves are hearsay but are admissible as a party admission under Hawaii Evidence Rule 803(a)(1), which is identical to Ohio Evidence Rule 801(D)(2)(a)); *People v. Whitney*, Mich.App. No. 294760, 2011 WL 222232 (Jan. 25, 2011) (text messages made by a defendant fall under the party admission exclusion from the hearsay definition, and the Confrontation Clause is inapplicable.)

**{¶44}** The problem we have in this situation, with both the Confrontation Clause and hearsay, is authentication. We do not have cell phone records or even a picture of these text messages. Thus, we find that the trial court erred in allowing the testimony regarding the "I hate you" text.

**{¶45}** That said, this error is harmless. The "I hate you" text does show that the victim and appellant were not getting along. However, that text is just cumulative of what the properly admitted evidence showed. As aforementioned, Tracee's mom testified that appellant and Tracee's relationship was rocky and volatile. She also testified that they broke up and got back together often. Tracee's cousin, Sierra, testified that when Tracee got out of appellant's car earlier that evening she was crying. Furthermore, as previously explained, there was properly admitted evidence that appellant was the shooter that committed the crimes.

**{¶46}** Therefore, this assignment of error is meritless.

<u>Third Assignment of Error</u>

**{¶47}** "The trial court erred when it denied Appellant's motion to suppress the photo lineup identification."

**{¶48}** Prior to trial, appellant moved to suppress Turner's identification of him in a photographic lineup. The trial court denied the motion to suppress. At trial, the photographic lineup was admitted into evidence over appellant's objection.

**{¶49}** When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and

evaluate the credibility of witnesses. *State v. Mills,* 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). Thus, a trial court's factual findings are afforded great deference and an appellate court will accept them if they are supported by competent, credible evidence. *State v. Fanning,* 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). That said, the trial court's legal conclusions are reviewed *de novo. State v. Burnside,* 100 Ohio St.3d 152, 2003–Ohio–5372, 797 N.E.2d 71, ¶ 8.

**{¶50}** With that standard in mind, we must determine whether the trial court erred in failing to suppress the pretrial identification. There is a two part test that must be met before a pretrial identification can be suppressed. First, a defendant must demonstrate that the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375 (1972). It is this likelihood of misidentification that violates a defendant's right to due process. *Id.* at 198 (suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous). If the first part of the test is met, then and only then, do we address the second part of the test. *Id.*; *State v. Taylor,* 2d Dist. No. 22232, 2008–Ohio–6048, ¶ 12. The second part of the test is reliability. Under this part the defendant must show that the identification in fact was unreliable under the totality of the circumstances. *Biggers*, 409 U.S. 188. In *Biggers*, the Court set forth the reliability factors as:

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199.

**{¶51}** On July 9, 2010, after Turner was released from the hospital, he went to the police station to view a photographic lineup. Turner still could not talk at that time because of the injury to his throat. He viewed this lineup twice, but was unable to

identify anyone as the perpetrator of the shooting. The lineup, including appellant's photograph, was in black and white because the police department's color printer was broken. On July 13, 2010, the police called Turner and asked him to return to the police department to view the photographic lineup again. It was the same photographs in a different order and all the photographs were now in color. Turner also viewed this lineup twice and on the second viewing identified appellant as the "possible" perpetrator of the crimes. On the photo lineup he wrote, "This could be but I K [sic] he doesn't have long hair ne [sic] more."

{¶52} The picture of appellant in the lineup was a picture of appellant with braids. At trial, Turner was asked why after identifying appellant as the perpetrator of the crimes, he wrote that appellant does not have long hair anymore. Tr. 597. Turner explained that he saw appellant on the night of the shooting and he did not have braids. Tr. 597.

{¶53} Appellant contends that allowing Turner to view the same lineup but in a different order for a total of four times violated R.C. 2933.83 and therefore, was unduly suggestive and unreliable. R.C. 2933.83(A)(6) specifically indicates how a photo lineup should be conducted with folders. Subsection (g) states that the eyewitness is not permitted to have more than two viewings of the folders. Consequently, he contends that the identification should have been suppressed.

{¶54} The failure to strictly comply with R.C. 2933.83 does not render the pretrial identification procedure per se impermissibly suggestive. Rather, all facts and circumstances must be considered. *See State v. Murphy,* 91 Ohio St.3d 516, 534, 2001–Ohio–112. Appellant admits as such, but contends that viewing the same lineup on the second day with the pictures in a different order implied that one of the persons pictured in the lineups was the perpetrator of the crimes. This, according to him, is what makes it unduly suggestive.

{¶55} The statute does not speak to the situation that is specifically before us. If the police want to show the witness a second photo lineup there are not specific guidelines for what pictures can be included in the second lineup. This raises a number of questions such as: can the pictures be the same but in a different order; do some of the pictures have to be excluded; or must all photos from the first lineup

be excluded from the second lineup? Therefore, since the statute does not address this exact situation, we cannot find a clear violation of the statute in this instance.

**{¶56}** Furthermore, we disagree with appellant's contention that showing the exact same pictures, but in color the second time, suggested to the viewer that the perpetrator was appellant. The most that could be said is that the line-up suggested to the viewer that the perpetrator was in that lineup. However, there is nothing to suggest that there was any identifying mark or something about appellant's picture that suggested that he was the perpetrator. Had every other picture but appellant's been changed, that would present a stronger and more viable argument that the lineup was unduly suggestive, i.e. it suggested that the perpetrator was appellant because the repetition of that picture would implicitly be more ingrained in the witnesses' mind.

**{¶57}** Therefore, when considering all the facts and circumstances, including the number of times that Turner viewed the photos, we cannot find that the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. The first prong of the *Biggers* test is not met.

**{¶58}** This assignment of error lacks merit.

<u>Fourth Assignment of Error</u>

**{¶59}** "Defense counsel provided ineffective assistance by failing to stipulate to the admissibility of exculpatory cell phone records and by failing to utilize those records to impeach a key state witness. Appellant was prejudiced by counsel's deficient performance such that he was deprived of a fair trial."

**{¶60}** We review a claim of ineffective assistance of counsel under the two part test articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984). Under this test, a reviewing court will not find counsel's performance ineffective unless the defendant can show his attorney's performance fell below an objective standard of reasonable representation and that prejudice arose from the lawyer's deficient performance. *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

{¶61} In evaluating the claim of deficient performance, the reviewing court must be highly deferential to counsel's tactics. *Strickland,* 466 U.S. at 689. The court should not focus on what, in hindsight, may have been a more appropriate course of defense. *See State v. Phillips,* 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 689; *State v. Hamblin,* 37 Ohio St.3d 153, 524 N.E.2d 476 (1988).

{¶62} Even if there is deficient performance, the defendant must also establish prejudice. To show prejudice, a defendant must prove that, but for his lawyer's errors, a reasonable probability exists that the result of the proceedings would have been different. *Bradley* at paragraph three of the syllabus. To establish that reasonable probability, the facts must be sufficient to undermine a court's confidence in the outcome. *Strickland* at 694.

{¶63} Tracee's cell phone records were not admitted at trial; defense counsel objected to their submission. The state then withdrew the exhibit. Appellant now contends that defense counsel should have stipulated to their admissibility and used that information to impeach Detective Patton. As discussed earlier, Detective Patton testified about text messages that were allegedly sent from appellant's phone to Tracee's phone. Detective Patton testified to the times those texts were received; however, Tracee's phone records showed that those texts were not received at those times. Tr. 483. Instead, they showed different times. Tr. 483. The one text that appellant contends he did not send, and Detective Patton should not have been permitted to testify about, was the "I hate you" text.

{¶64} We find that the act of failing to stipulate to the admissibility of the phone records does not amount to deficient performance or prejudice. As the state points out, the fact that the times did not match Detective Patton's testimony was brought to light during the trial and was presented to the jury through the testimony. Therefore, the discrepancy was available for the jury to consider. Furthermore, it may have been trial strategy to not have the records of Tracee's cell phone admitted at trial. Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier,* 61 Ohio St.3d 247, 255, 574 N.E.2d

483 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley,* 42 Ohio St.3d 136, 141–142, 538 N.E.2d 373 (1989). Counsel's decision to not stipulate to evidence that was potentially otherwise inadmissible, does not amount to a substantial violation.

{¶65} This is especially the case when considering that the text was harmless. Therefore, no prejudice amounted from any alleged deficiency. As previously explained, there was sufficient other evidence to find that appellant committed this crime. For instance, Turner testified that Tracee identified Melvin as the person coming up the front porch steps prior to the shooting. Turner also saw appellant on the porch steps and later identified him as the shooter. Furthermore, there was also testimony from Tracee's mom and cousin that showed that Tracee and appellant had a rocky relationship and were not getting along that day.

{¶66} Therefore, for the above stated reasons, this assignment of error lacks merit.

Fifth Assignment of Error

{¶67} "The trial court erred when it sentenced Appellant to multiple consecutive sentences for allied offenses of similar import in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution and section 10 and 16, Article I of the Ohio Constitution."

{¶68} The trial court did not merge the felonious assault with a deadly weapon, felonious assault by causing serious physical harm, and attempted murder offenses. Turner was the victim of these three offenses. Appellant contends these offenses are allied offense of similar import and therefore, the trial court erred when it failed to merge them.

{¶69} R.C. 2941.25, concerning allied offenses of similar import, provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or

more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶70}** This statute "codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, which prohibits multiple punishments for the same offense." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 13, quoting *State v. Underwood,* 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 23. Thus, R.C. 2941.25 in essence is a merger statute. *Williams* at ¶ 13.

**{¶71}** In order to ensure compliance with R.C. 2941.25 and the Double Jeopardy Clause, allied offenses of similar import are required to be merged at sentencing. *Id.* at ¶ 15. "'Thus, when the issue of allied offenses is before the court, the question is not whether a particular sentence is justified, but whether the defendant may be sentenced upon all the offenses.'" *Id.*, quoting *Underwood* at ¶ 27.

**{¶72}** The Ohio Supreme Court has recently explained that we review a trial court's determination of whether a defendant's offenses should merge under R.C. 2941.25 under a de novo standard of review. *Id.* at ¶ 1.

**{¶73}** The test used to determine if offenses are allied offenses of similar import that require merger at sentencing is found in the Ohio Supreme Court's *Johnson* decision. In that case, the Court explained:

When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered.

"* * *

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other. *Blankenship,* 38 Ohio St.3d at 119, 526 N.E.2d 816 (Whiteside, J., concurring) ("It is not necessary that both crimes are always committed

by the same conduct but, rather, it is sufficient if both offenses *can be* committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses." [Emphasis sic]). If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J., dissenting).

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

*State v. Johnson*, 128 Ohio St. 3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 44, 48-51.

**{¶74}** We explained that the *Johnson* test is as follows: "1) can the two offenses be committed by the same conduct; and if so, 2) looking at the facts of the case, were the two offenses committed by the same conduct as a single act with a single state of mind." *State v. Dixon*, 7th Dist. No. 10MA185, 2013-Ohio-2951, ¶ 31, quoting *State v. Helms*, 7th Dist. No. 08MA199, 2012-Ohio-1147, ¶ 24.

**{¶75}** Here, appellant was charged with felonious assault under R.C. 2903.11(A)(1) and (A)(2) and attempted murder as defined in R.C. 2903.02(A) and R.C. 2923.02(A).

**{¶76}** Our analysis starts with the two felonious assault convictions and whether the trial court erred when it failed to merge the two. Felonious assault as

defined in R.C. 2903.11(A)(1) requires the state to prove that the defendant knowingly caused serious physical harm to another. Section (A)(2) requires the state to prove that the defendant knowingly caused or attempted to cause physical harm to another by means of a deadly weapon. The victim of both felonious assaults was Turner. Thus, the shooting of Turner constituted the same conduct to prove both felonious assault convictions. Furthermore, at sentencing the state conceded that the two felonious assault convictions should be merged for purposes of sentencing. Likewise, in the appellate brief, the state concedes that the trial court erred when it did not merge the two felonious assault convictions. Considering both the state's concession and the *Johnson* test, the trial court erred when it did not merge the two felonious assault convictions.

**{¶77}** We now turn to whether the felonious assault convictions should merge with the attempted murder conviction. This is the major issue that is at controversy under this assignment of error.

**{¶78}** Courts have concluded, post-*Johnson*, that felonious assault and attempted murder meet the first prong on *Johnson*, i.e. the offenses can be committed by the same conduct. *Helms*, 2012-Ohio-1147, at ¶ 28; *State v. Sutton*, 8th Dist. No. 90172, 2011-Ohio-2249. The conduct of pointing and shooting a gun at a person or causing or attempting to cause physical harm through other means can result in the death of one or more individuals. That same conduct can also fall short of death and only cause physical harm. *See, Helms* at ¶ 28.

**{¶79}** Therefore, we move on to the second question - looking at the facts of the case, were the two offenses committed by the same conduct as a single act with a single state of mind.

**{¶80}** Here, the facts of this case are that appellant shot into the house at 63 Manchester Avenue and Turner was shot twice - once in the jaw and once in the leg. Tr. 581. Turner testified that the shots were rapid fire, i.e. immediate succession. Tr. 604. He further explained that there were about 8 or 9 shots fired. Tr. 584. There was no other interaction between Turner and appellant. Thus, the two felonious assault convictions and the attempted murder conviction were based on those facts.

{¶81} The state cites to an Eighth Appellate Court decision to support its position that the felonious assault convictions do not merge with the attempted murder conviction. *State v. Hines*, 8th Dist. No. 90125, 2008-Ohio-4236. Although *Hines* was decided before the trial court's decision in *Johnson*, it does discuss whether, given the facts of the case, the act of attempted murder and the act of felonious assault were committed with a separate animus. The state is correct that in that case, the Eighth Appellate Court determined that the acts were committed with a separate state of mind. This was based on the fact that the appellant shot the victim in the abdomen, then proceeded to try to shoot the victim again, but the gun was jammed and did not go off. The victim then left the building, appellant followed the victim and continued to attempt to shoot the victim while following him outside the building. *Id.* at ¶ 47. These facts do show a separate animus. However, they are distinguishable from the case at hand.

{¶82} Here, although Turner was shot twice, the shots were fired in rapid succession with no delay in between. There is no evidence to suggest that appellant continued to follow Turner or did any other act that shows a separate animus or separate state of mind. The single purpose as to Turner was to injure and/or kill him. If there had been some delay between the shots or evidence that appellant aimed at different portions of the victim's body then it could be concluded that the shots were not a single act with a single state of mind. Here, and given the fact that we have rapid fire of 8 or 9 shots into a habitation, there is no indication that one shot was intended to cause physical harm and the other was intended to cause death. Therefore, given the specific facts of this case, the felonious assault convictions were required to merge with the attempted murder conviction.

{¶83} This assignment of error has merit.

Sixth Assignment of Error

{¶84} "The trial court erred when it submitted verdict forms to the jury which indicated that in order to find Appellant not guilty they had to do so beyond a reasonable doubt."

{¶85} The jury verdict form for aggravated murder reads as follows:

WE, THE JURY, FIND THE DEFENDANT, MELVIN SHAW, JR.,
* _____ BEYOND A REASONABLE DOUBT OF AGGRAVATED
MURDER, IN VIOLATION OF R.C. 2903.01(A)(F)
*INSERT IN INK, GUILTY OR NOT GUILTY

05/15/12 Verdict Form.

{¶86} The forms for attempted murder, felonious assault and improper discharge of a firearm in a habitation were similar to the aggravated murder form. The only difference was the offense.

{¶87} Appellant complains that the wording on the forms gave the jury two choices: 1) to find him guilty beyond a reasonable doubt; or 2) to find him not guilty beyond a reasonable doubt. Appellant correctly points out that it is not necessary to find him not guilty "beyond a reasonable doubt." The correct standard is that a jury must find him guilty beyond a reasonable doubt. If the jury cannot conclude that, then appellant must be found not guilty.

{¶88} Appellant did not object to the jury verdict forms, thus, he waives all but plain error under Crim.R. 52(B). Use of the discretionary plain error doctrine requires an obvious error that affected substantial rights under exceptional circumstances. Crim.R. 52(B); *State v. Barnes,* 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). An alleged error cannot rise to the level of plain error unless the outcome clearly would have been different if not for the error. *State v. Waddell,* 75 Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996).

{¶89} Two appellate courts have reviewed almost identical jury verdict forms to the ones that were used in the case at hand. *State v. Wilson*, 3d Dist. No. 1-09-53, 2010-Ohio-2947, ¶ 20-29; *State v. Schlee*, 11th Dist. No. 2004-L-070, 2005-Ohio-5117, ¶ 29-42. In *Wilson*, appellant objected to the jury verdict form, which resulted in the Third Appellate District reviewing the alleged error under a structural error analysis. *Wilson* at ¶ 20. In *Schlee*, appellant did not object to the form, thus, the Eleventh Appellate District reviewed the alleged error under a plain error analysis. *Schlee* at ¶ 27. Although the cases were reviewed under different standards, both courts concluded that the forms were flawed; however, that flaw did not amount to reversible error. *Wilson* at ¶ 26-27; *Schlee* at ¶ 41-42. Both appellate courts, in

reaching that conclusion, reviewed the jury instructions. The jury instructions in both of those cases accurately instructed the jury if the state did not prove all the essential elements of the crime, they were required to find the offender not guilty. *Wilson* at ¶ 25; *Schlee* at ¶ 33-40. Likewise, the jury was also instructed that the defendant is presumed innocent until his guilt is established beyond a reasonable doubt. *Wilson* at ¶ 25; *Schlee* at ¶ 33-40.

{¶90} Therefore, on the basis of those cases and the wording of the forms used here, it is clear that the jury verdict forms are flawed. However, that error will not rise to reversible error if the jury instructions were correct.

{¶91} The jury instructions in this case provided:

This is a criminal case, and in a criminal case, the defendant is presumed not guilty until his or her guilt is established beyond a reasonable doubt. The defendant must be acquitted unless the State presents evidence that convinces you beyond a reasonable doubt of every essential element of the crimes charged in the indictment.

Tr. 684.

{¶92} Reasonable doubt was then defined. The instruction continued with an advisement on aggravated murder:

The Defendant is charged in Count 1 with aggravated murder. Before you can find the Defendant guilty, you must find beyond a reasonable doubt that on or about June 19th, 2010, in Mahoning County, Ohio, the Defendant purposely and with prior calculation and design caused the death of Tracee Banks.

* * *

If you find that the State failed to prove beyond a reasonable doubt all the essential elements of aggravated murder as defined in Count 1, then verdict must be not guilty of that offense, * * *.

Tr. 689, 693.

{¶93} Similar instructions were given regarding the remaining indicted offenses. Tr. 697, 699-703.

{¶94} As a final, conclusory instruction, the trial court advised:

Now if you find that the State proved beyond a reasonable doubt all of the essential elements of any one or more of the offenses charged in the separate counts or specifications in the indictment, your verdict must be guilty as to such offense or offenses or specifications, according to your findings. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of any one or more of the offenses charged in the separate counts or specifications in the indictment, your verdict must be not guilty as to such offense or offenses according to your findings.

Tr. 703-704.

**{¶95}** Considering these instructions, we must conclude that the instructions given by the trial court were consistent and accurate. *Schlee*, 2005-Ohio-5117, at ¶ 41. The instructions did not even remotely imply that appellant had any burden to prove his innocence. *Id.* Therefore, considering the instructions, the flawed jury verdict forms do not amount to reversible error. As the Eleventh Appellate District adequately explained in *Schlee*:

Accordingly, while the jury verdict form itself was flawed, when taken as a whole, the jury instructions were not so tainted as to rise to the level of plain error. The trial court's other instructions limited any potential prejudice. There was overwhelming evidence of appellant's guilt presented at trial so, but for the flaw in the jury verdict form this court cannot conclude that the outcome of the trial would have been different.

*Schlee*, 2005-Ohio-5117, at ¶ 42.

**{¶96}** Therefore, for those reasons this assignment of error lacks merit.

### Conclusion

**{¶97}** The first, second, third, fourth and sixth assignments of error lack merit. The fifth assignment of error has merit. The trial court erred when it did not merge the felonious assault convictions with each other and with the attempted murder conviction. Consequently, the convictions are affirmed, the trial court's ruling on merger is reversed, and the matter is remanded for resentencing. On remand, the

state retains the right to elect which crime it seeks to pursue on resentencing, i.e. felonious assault or attempted murder. *Whitfield,* 2010–Ohio–2, at ¶ 25.


Waite, J., concurs.
DeGenaro, P.J., concurs.