[Cite as *State v. Thompson*, 2016-Ohio-7521.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 26954 |
| | : | |
| v. | : | Trial Court Case No. 13-CR-377/2 |
| | : | |
| CRAIG THOMPSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of October, 2016.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

ANTONY A. ABBOUD, Atty. Reg. No. 0078151, Gounaris Abboud, LPA, 130 West Second Street, suite 2000, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Craig Thompson appeals from his conviction for complicity to commit

burglary. Finding no error, we affirm.

## I. Background

{¶ 2} In March 2013, Thompson was indicted on a charge of complicity to commit burglary, in violation of R.C. 2911.12(A)(1), stemming from the entry of his co-conspirator, Bradley Burns, into the residence of Charles Fox, where Burns was expected to find $50,000.[1] Thompson moved to suppress evidence and statements, and a suppression hearing was held. The trial court overruled the suppression motion in August 2013.

{¶ 3} In January 2014, the trial judge recused himself and the case was reassigned to a different judge. In April 2014, the case was tried to a jury. A mistrial was declared after the jury reported that it was deadlocked. Shortly before retrial, Thompson moved to dismiss the indictment on double-jeopardy grounds. The trial court overruled the motion, and Thompson appealed. We found no double-jeopardy violation and affirmed. *State v. Thompson*, 2d Dist. Montgomery No. 26280, 2014-Ohio-5583.

{¶ 4} A second jury trial was held in December 2015. This jury found Thompson guilty, and the trial court sentenced him to six years in prison.

{¶ 5} Thompson appealed.

## II. Analysis

{¶ 6} Thompson assigns six errors to the trial court. The first and second assignments of error present sufficiency and weight-of-the-evidence challenges respectively. The third assignment of error challenges the overruling of Thompson's motion to suppress. The fourth assignment of error challenges on hearsay grounds the admission of text messages. The fifth assignment of error claims ineffective assistance

---

[1] Burns was indicted on charges of burglary and kidnapping.

of counsel. And in the sixth assignment of error Thompson challenges his sentence, alleging that the trial judge included a punishment factor because Thompson exercised his right to a jury trial.

A. *The sufficiency and weight of the evidence*

{¶ 7} The first assignment of error alleges that Thompson's conviction is based on insufficient evidence. And the second assignment of error alleges that his conviction is against the manifest weight of the evidence. In these assignments of error Thompson argues that the evidence does not show that he helped or intended to help Burns commit the burglary. Thompson says that the evidence supports his theory at trial that it was his brother, Brandon Thompson, who helped Burns.

{¶ 8} A sufficiency-of-the-evidence challenge requires that we consider "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "We will not 'disturb a verdict on appeal on sufficiency grounds unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." ' " *State v. Montgomery*, Ohio Sup. Ct. Slip Opinion No. 2016-Ohio-5487, ¶ 74, quoting *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 94, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997).

{¶ 9} In contrast to a sufficiency challenge, a manifest-weight challenge "concerns 'the inclination of the *greater amount of credible evidence* * * * to support one side of the issue rather than the other.' " (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "A

manifest-weight challenge requires us to consider the entire record, including the credibility of the witnesses, the weight of the evidence, and any reasonable inferences and determine whether ' "the [panel] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." ' " *Montgomery* at ¶ 75, quoting *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 10} Eighty-three-year-old Charles Fox testified that in November 2012 he hired Thompson to do some repairs to the inside and outside of his residence on Heather Hollow Drive in Harrison Township, Ohio. Thompson was dating Fox's house guest, Shai Bathini, at the time. She convinced Fox to hire Thompson. Thompson worked on the house until January 2013. While he was working, either Fox or Bathini was usually there, though there may have been times that Thompson was alone.

{¶ 11} Bathini testified that while they were dating Thompson was in financial distress and needed money very quickly and very badly. Text messages between her and Thompson presented at trial suggest the same. Bathini said that his financial problems, and his anger at her for getting him further into debt and not helping him, caused their relationship to end in mid-January 2013.

{¶ 12} Nineteen-year-old Brad Burns lived at America's Best Value Hotel and worked at the Tim Horton's on Main Street in Englewood, Ohio. Burns testified that Thompson was a regular customer at Tim Horton's and that they became friends. Burns said that Thompson often gave him rides to and from work and to and from the home of

Burns's girlfriend, Kaitlyn Kerg. In February 2013, Burns was having money problems too. One day, said Burns, Thompson approached him with a proposition. Thompson told him that he "did work for the man" who lived on Heather Hollow Drive and that the man kept $50,000 in a safe in his bedroom. (Trial Tr. 462) He told Burns where and how to enter the house, where a spare key was hidden, and where he could find the man's bedroom. If Burns got the money, they were going to split it 50/50. Burns testified that two people knew about the plan—his girlfriend and a manager at Tim Horton's, Jeff Molton, who told Burns that "it was not a good idea," (*Id.* at 476). Kerg testified that she knew about the plan. The night before the burglary, Kerg said, she, Burns, and Thompson had gone back to Burns's hotel room. There Thompson and Burns started talking about how they needed money and were sick of being broke. Thompson then said that he knew of a place that they could rob that had a safe with a lot of money in it.

{¶ 13} On February 3, 2013, after the Super Bowl game, said Burns, Thompson picked him up in his red pickup truck. They stopped at a Meijer store so that Burns could steal a roll of duct tape. Thompson then drove Burns to Fox's house. Burns said that he did not know Fox or Bathini, that he had never been to Fox's house before, and that he could not have found his way to the house from Meijer. When they got to Fox's house, Thompson drove past it a couple of times, and while he did, he explained to Burns where the bedroom was, that the safe would be in the closet off the bedroom, how to enter the house through the unlocked side door, and where the spare key to the house door was hidden. Thompson knew that the spare key was hidden in the garage on a nail under the deck leading up to the door to the house. When he had worked on the house, Fox allowed him to store his tools and paint under the deck. Thompson then stopped and Burns got

out. Burns testified that he left his cell phone and his hotel room key in Thompson's truck because he did not want to risk dropping either inside the house. Burns testified that he entered the house through the side of the garage, retrieved the spare key, and entered the house. He went straight upstairs to the bedroom in which Thompson had said the safe was located. Burns went directly into the closet and retrieved the safe. Burns said that he did not go into any other room.

{¶ 14} Fox was alone in the house that night because Bathini was at a Super Bowl party in Union, Ohio. He testified that he was in bed when he was awakened by a noise. He turned on the light and saw Burns—wearing a mask—standing in the doorway to his bedroom. At some point during the encounter, Burns ordered Fox out of bed and duct taped his hands together. Burns said to Fox, " 'Where's your money?' " (Trial Tr. 270). Fox replied that Burns would find money in his wallet, on a table in the bathroom. After retrieving the money from the wallet, Burns walked into the closet and found the safe. Burns said to Fox, " 'I want you to open the safe.' " (*Id.* at 272). Fox replied that he did not remember the combination. Burns hoisted the safe onto his shoulder and started to carry it downstairs. Fox told Burns that the combination was in the basement and that he would get it. When they got downstairs, Burns put down the safe and cut the duct tape binding Fox's hands. Fox retrieved the combination and opened the safe. There was no money inside. Burns then left, taking some jewelry from the safe, along with a Kindle, an iPad, and a cell phone. Fox watched him go through a window to see if he got into a car, but he did not. Fox then called the police.

{¶ 15} The police arrived quickly. Montgomery County Sheriff's Deputy Justin Bone was the first officer to arrive, arriving within minutes of being dispatched. As he

walked through the house with Fox, Bone and Fox noted that no other room had been disturbed. And there was no sign of forced entry. Deputy Bone determined that the point of entry was the door into the garage from the outside. Fox told the deputy that the spare key was missing. A police dog led officers to a storm drain in which they found a knit hat with eye holes cut in it.

{¶ 16} Burns testified that when he left Fox's house he could not find Thompson. He was unfamiliar with the area. Burns said that he got scared when he saw police cruisers, so he fled on foot, throwing and hiding items as he ran. He ended up at a laundromat. He asked a woman there if he could use her cell phone. She let him, and Burns called his own cell phone, which he had left in Thompson's truck, hoping that Thompson would answer and come get him. Burns also texted his phone. One of the messages read, "Hey, it's me Brad, call me." (Trial Tr. 500). Another read, "Call me, answer the phone." (*Id.* at 501).

{¶ 17} The woman whose phone he used was Maria Bateman. She testified that between midnight and 1:00 a.m., she was doing her laundry at the laundromat when Burns, claiming to be stranded, asked if he could use her cell phone. When he was done, Burns asked Bateman if she would drive him to the Tim Horton's in Englewood or to his hotel. Bateman agreed to drive him to Tim Horton's. On the way, she noticed a red or burgundy pickup truck on Main Street that had been pulled over by the police.

{¶ 18} When Burns fled Fox's house, Thompson was parked a little way down Heather Hollow Drive. Deputy Kyle Baranyi testified that he saw the truck when he responded to the burglary dispatch. He had arrived in the area at 12:33 a.m., but instead of going to Fox's house he drove down Heather Hollow Drive, looking for anything

suspicious. He turned around, and as he drove back towards Fox's house, he noticed a red Ford F-150 truck parked several houses away from Fox's on Heather Hollow Drive. The truck was around a bend in the street facing in the direction of Fox's house, though it did not have a good view of the house. What drew Deputy Baranyi's attention was the fact that, despite being very cold out, and unlike the other vehicles he saw, the windows of the truck were not frosted over. This suggested to Deputy Baranyi that the truck had not been there long. He shined his cruiser's spotlight on the truck but saw no one inside. Thompson would later admit that he "laid back" to avoid being seen. (Trial Tr. 834). Baranyi continued driving around the neighborhood and then to Main Street. He soon saw the same red truck about to turn from the neighborhood onto Main Street. The truck did not make a complete stop at the stop sign, and it did not have a front license plate. So Deputy Baranyi pulled it over.

{¶ 19} Deputy Baranyi approached the truck and asked Thompson where he was coming from and where he was headed. Thompson replied that he was coming from his friend Shai's house on Heather Hollow Drive. Suspicious and wanting to confirm his story, Deputy Baranyi asked Thompson to come back to his cruiser to talk further. In the cruiser, Baranyi asked Thompson for Shai's telephone number. Thompson said that he had her number stored in his phone, which was in the truck under the dashboard. Deputy Baranyi went to the truck to get the phone, but he was only able to find two cell phones in a cup holder on the passenger side. He brought them back to Thompson who said that one of the phones belonged to his friend Brad. The other phone belonged to him, said Thompson, but it did not have Shai's number in it. After getting a more specific location from Thompson, Deputy Baranyi returned to the truck and found the phone that he was

looking for. With Thompson's permission, Deputy Baranyi searched the phone for Shai's number. Using his own cell phone, Baranyi called the number. Shai answered and told him that she knew Thompson and that she lived at Fox's address on Heather Hollow Drive. But she said that she was not currently there, that Thompson had not been visiting her, and that they had no plans to see each other that night.

{¶ 20} Meanwhile, the phone belonging to Brad repeatedly rung, showing the same number. Text messages were also sent from that number. Deputy Baranyi testified that one message said, " 'Hey, it's me Brad, call me, call me.' " (Trial Tr. 426). A second message said, " 'Answer the phone.' " (*Id.*). Baranyi called the number that was calling Burns's phone and spoke with Maria Bateman, who told him about her encounter with Burns. Deputy Baranyi then relayed to other deputies that Bateman had dropped Burns off at Tim Horton's.

{¶ 21} Deputy Baranyi also learned from Thompson that Burns had left his hotel room key in the cup holder on the passenger side of the truck. The key was to room 305 at America's Best Value Inn. With Thompson's consent, Deputy Baranyi searched the truck further and found an invoice for repairs performed by Thompson at Fox's address on Heather Hollow Drive although two of the address numbers were transposed. (*Id.* at 431-432). After completing his investigation at the scene of the traffic stop, Deputy Baranyi contacted Detective Kent Saunders, who requested Thompson to come in to speak to him. Thompson agreed, and Baranyi brought him to district headquarters. Police officers found Burns at Tim Horton's and arrested him. They brought him in to speak with Detective Saunders too.

{¶ 22} Saunders testified that he spoke to Thompson first. Initially, Thompson

claimed that he knew Burns and that he had driven Burns to Burns's girlfriend's house. Thompson maintained that he knew nothing about a burglary. He said that he was on Heather Hollow Drive that evening because he was waiting for Shai, his ex-girlfriend, in a park down the street from her house because she had just gotten back into town.

{¶ 23} Detective Saunders then spoke to Burns. Initially, Burns told Saunders, "I didn't have anything to do with it." (Trial Tr. 507). Later, though, Burns admitted his involvement. Burns told Saunders that Thompson had driven him to the location of the burglary. With this information from Burns, Saunders went back to talk to Thompson. When confronted with Burns's statement, Thompson changed his story. He told Detective Saunders that he had dropped Burns off at Meijer. He said that, before Burns exited the truck, he gave Burns "options." (*Id.* at 840). Thompson said that he told Burns about "the old guy" and about "$50,000 being buried in the back yard." (*Id.* at 841). Thompson claimed that after he dropped Burns off he did not see him again. Detective Saunders testified that Thompson told him that Burns must have left his phone and hotel key card in his truck when he got out.

{¶ 24} Burns helped Detective Saunders locate the things that he had taken from Fox's house. He led the police to the coat that he was wearing when he exited the house, which was under a bridge in a ravine area a half mile from the house. In the pockets of the coat, police found a roll of duct tape, wadded-up duct tape, the gloves Burns wore during the burglary, the spare key, $90 in cash, and jewelry from the safe.

{¶ 25} Thompson was convicted of complicity to commit burglary. The complicity statute pertinently states: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C.

2923.03(A)(2). And the burglary statute pertinently states: "No person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense." R.C. 2911.12(A)(1). "A person acts purposely * * *, when the gist of the offense is a prohibition against conduct of a certain nature * * *, [if] it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶ 26} Thompson contends that the evidence does not show that he helped Burns commit the burglary or that he had the requisite intent to help him. Thompson says that most of the State's witnesses did not connect him to the crime and those that did had reason to lie or lacked credibility. He says that the State's witnesses were either getting something in exchange for their testimony or their testimony was contradicted by previous statements. Thompson also argues that the evidence supports the defense theory at trial that it was his brother, Brandon Thompson, who gave Burns the information that he needed to commit the burglary.

{¶ 27} Credibility is irrelevant in a sufficiency challenge. The issue here is whether the State's evidence, if it is believed, would convince a reasonable mind, beyond a reasonable doubt, that Thompson specifically intended to aid or abet Burns to commit a crime inside Fox's house. We think that Burns's testimony alone, if believed, is sufficient to support the conviction for complicity to commit burglary.

{¶ 28} Witness credibility is relevant in a weight-of-the-evidence challenge. But "[t]he credibility of the witnesses and the weight to be given to their testimony is a matter

for the trier of facts, the jury here, to resolve." *State v. White*, 2d Dist. Montgomery No. 20324, 2005-Ohio-212, ¶ 65, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict." (Citation omitted.) *Id.* at ¶ 67.

**{¶ 29}** Thompson says that Fox never mentioned him or claimed that Burns seemed to have previous knowledge of the residence. But Fox did say that he hired Thompson to do repair work on the house, that Thompson stored his tools and paint under the deck in the garage—the same place Fox kept his spare key—and that sometimes Thompson was at the house when neither he or Bathini were present. Fox could not identify the intruder, but his testimony shows that Thompson had an opportunity to learn the layout of the house, to see the items that were in the house, including the safe, to see how to enter the house from the outside, to discover where a spare key was hidden, and to learn who would likely be in the house on Super Bowl Sunday.

**{¶ 30}** Thompson argues that Burns was not a credible witness. He points out that Burns admitted that he did not implicate Thompson until he (Burns) learned that it would be in his best interest to do so. Thompson says that Burns had time to review the discovery packet and come up with a plausible story. Burns entered into a plea agreement with the State in which he would receive a sentence of 2-4 years in prison in exchange for his truthful testimony in this case. The jury was well aware of the plea deal and the reduced sentence that Burns could get for testifying, and it could weigh his testimony accordingly. Moreover, on the night of the burglary—well before the plea agreement—Burns had told Detective Saunders that Thompson picked him up and drove him to Fox's

house and that he planned the burglary with Thompson. Thus Burns's testimony is consistent with the testimony presented by the other witnesses. And nothing in the record suggests that he did not testify truthfully.

{¶ 31} Thompson says that Kerg, Burns's girlfriend, lied because she was trying to help Burns. Kerg testified that she was present when Thompson and Burns planned the burglary. But she admitted that she was under the influence of drugs and that the entire event was fuzzy. Kerg said that she was not sure how she got home that night. Moreover, says Thompson, she made statements to Detective Saunders and Wayne Miller, about whether she knew Thompson, that contradict her testimony at trial. Finally, Thompson points out that Kerg picked out two photos from a photo array that she thought could be Thompson. She said that she was 95% sure about one photo and 15% sure about the other. The photo that she was 95% sure about was not Thompson.

{¶ 32} Kerg admitted taking Xanax on the evening that she heard Thompson and Burns planning the burglary, but she said that she did not take that many and did not think that it affected her memory at all. Indeed, she was able to remember details about the conversation that are consistent with Burns's testimony about specific aspects of the plan. Kerg may not have been able to remember how much longer they were in the hotel room, or how she got back to Huber Heights, but it is not necessarily because of the Xanax. As to Kerg's statements to Detective Saunders and Wayne Miller about whether she knew Thompson, at trial she testified that she had met Thompson on prior occasions. But during her first interview with Detective Saunders, Kerg told him that she had never met him. In a later interview, Detective Saunders confronted Kerg with the fact that she had told him she had never met Thompson. Kerg denied saying that, and Saunders eventually realized

that he had misunderstood her. Wayne Miller testified that Kerg had told him that Thompson picked her up from her grandparents' house in a silver car, which is consistent with her testimony at trial. Finally, Kerg identified two individuals from the photo array as being the person who planned the burglary with Burns. But this was over two-and-a-half years after the conversation between Thompson and Burns. She testified that Thompson was not an important person in her life and that she had met him only a few times. Even so, one of the photos that she selected was, in fact, Thompson, even if the other was not. The jury was in a position to assess Kerg's credibility.

{¶ 33} Thompson argues that Bathini's testimony was merely circumstantial and was insufficient to convict him. He says that she merely testified to a stream of text messages relating to his financial situation. But he never indicated that he would resort to criminal activity. He did indicate that he would likely sell his assets to aid his circumstance. Thompson also disputes Bathini's claim that she and Thompson had nothing to speak about the night of February 3, 2013. He says that their relationship had just ended and that Bathini was returning from a vacation. Thompson did not have direct knowledge of her trip, but his family members did. It would not be a stretch of the imagination for him to have gained this information from family, leading him to make an attempt to speak with her on the night in question.

{¶ 34} Bathini testified about her relationship with Thompson and how it ended on a bad note. This makes it unlikely that he was on Heather Hollow to see her on the night of the burglary. Also, Bathini testified about text messages between her and Thompson showing that Thompson was in financial distress and needed money, giving him a reason to help Burns break into Fox's house.

{¶ 35} Thompson also argues that Detective Saunders's testimony was merely circumstantial and was insufficient to convict him. Saunders testified about questioning Burns and Thompson. Detective Saunders acknowledged that Burns repeatedly told him that Thompson had dropped him off at Meijer before changing his story to aid his own cause. Detective Saunders's recollection of his conversation with Thompson corroborated Burns's initial story.

{¶ 36} Thompson argues that Burns learned about Fox's house from his (Thompson's) brother Brandon Thompson. But the weight of the evidence does not support this defense theory. Although Brandon testified that he had been to Fox's house on one occasion, Fox testified that he never saw anyone else at the house other than the defendant. Bathini testified similarly and presented text messages from Thompson complaining that Brandon did not show up to help him do repairs to the roof. Even if Brandon had been to the house on one occasion, and even if he had seen the spare key while putting supplies under the deck, this one visit would likely not have given him enough information to help Burns plan the burglary. Brandon would not have known that the door into the garage was often kept unlocked. And having worked only outside the house, Brandon would not have known the inside layout of the house. And he admitted that he did not know anything about what would be found on the inside if Burns was successful in entering the house. Furthermore, Brandon Thompson was in jail from January to March. Burns's phone and hotel room key were found in Thompson's truck, and Thompson's truck was parked near Fox's house when Burns committed the burglary. The jury reasonably rejected Thompson's defense that his brother supplied Burns with

the information to burglarize the house.

{¶ 37} A review of the entire record reveals no inconsistencies or other conflicts in the evidence that indicate to us a lack of credibility of the witnesses. Accordingly, Thompson has not shown that "a miscarriage of justice" occurred or that the jury "lost its way" when it found him guilty.

{¶ 38} The first and second assignments of error are overruled.

## B. *The motion to suppress*

{¶ 39} The third assignment of error challenges the overruling of Thompson's motion to suppress on three grounds: (1) after the original trial judge recused himself, the second trial judge did not re-evaluate the motion to suppress; (2) the traffic stop was unconstitutionally prolonged; and (3) during the stop Thompson was not advised of his *Miranda* rights.

### *The effect of recusal*

{¶ 40} On Thompson's motion, the original judge in this case recused himself five months after he overruled Thompson's motion to suppress.[2] Thompson filed a second motion to suppress, asking for a new hearing on the first motion because of the original judge's recusal. While there was no written ruling on the second motion, the new judge said at trial that the original judge "made his ruling, and I'm standing by his ruling. I'll note your continuing objection." (Trial Tr. 833). Thompson says that the new judge should have

---

[2] Thompson incorrectly asserts in his brief that the original trial judge "was disqualified by order of the Supreme Court of Ohio." The Court did not disqualify the judge. Rather, the trial Judge recused himself by entry filed on January 16, 2014, upon oral request made at a pre-trial conference. Then the Supreme Court dismissed Thompson's affidavit of disqualification as moot, saying that the judge voluntarily recused himself.

reconsidered the suppression issue because of the alleged bias that the original judge had against him.

{¶ 41} The reason for the recusal is not entirely clear. Thompson says in his brief that the judge "recused himself after revealing a bias against the Appellant." But the basis of Thompson's recusal motion was that the judge had an ex parte conversation with the victim. According to Thompson, at the final pre-trial conference the judge said, " 'I have talked privately with the victim in this case concerning the plea agreement for the co-defendant and [the judge] stated that he (the victim) really wants your man (Defendant-Thompson).' " *Affidavit of Disqualification of Judge*, 2. We are not convinced that this shows a bias against Thompson. Moreover, the trial court had overruled Thompson's motion to suppress on August 13, 2013, five months before the recusal. And in a motion to continue, that Thomson filed on November 25, 2013, it states that Burns pled on September 16, 2013, but the plea deal was apparently not complete until a Proffer Agreement was signed on October 25, 2013. Therefore whatever communication the victim may have had about the plea deal was well after the ruling on the suppression motion.

{¶ 42} Also, a trial judge's recusal does not render void a suppression ruling made by that judge. Even a ruling made by a disqualified judge before being disqualified is not void. *Beer v. Griffith*, 54 Ohio St.2d 440, 442, 377 N.E.2d 775 (1978) ("Although a judge would be without power to hear and determine a cause after disqualification, his judgment, however erroneous, before disqualification is not void."); *Evans v. Dayton Newspapers, Inc.*, 57 Ohio App.3d 57, 58, 566 N.E.2d 704 (2d Dist.1989) (saying that "being informed that he [the judge] should not proceed did not render his pretrial orders

void"). So the new judge in this case was not required to reconsider the suppression ruling. We turn now to that ruling.

*The length of the traffic stop*

{¶ 43} "Review of a trial court's ruling on a motion to suppress is 'a mixed question of law and fact.' *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. We accept the trial court's factual findings as long as they are supported by competent, credible evidence. However, we review de novo the application of the law to these facts. " (Citations omitted.) *State v. Belton*, Ohio Sup. Ct. Slip Opinion No. 2016-Ohio-1581, ¶ 100.

{¶ 44} "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, __ U.S. __, 135 S.Ct. 1609, 1612, 191 L.Ed.2d 492 (2015), quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). "An officer * * * may conduct certain unrelated checks during an otherwise lawful traffic stop. But * * * he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615.

{¶ 45} "[A] police officer who lacks probable cause but whose observations lead him reasonably to suspect that a particular person's behavior is criminal may detain the person briefly to investigate the circumstances that provoked the suspicion." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 13. "[T]he officer may

ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at ¶ 14. " '[T]he detention of a stopped driver may continue beyond [the normal] time frame when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop.' " (Citations omitted.) *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 15, quoting *State v. Howard*, 12th Dist. Preble Nos. CA2006-02-002, CA2006-02-003, 2006-Ohio-5656, ¶ 16.

{¶ 46} There is no dispute that Deputy Baranyi's initial traffic stop of Thompson was lawful. Baranyi testified that he saw Thompson fail to come to a complete stop and saw that Thompson's truck was missing a front license plate. Thompson's problem with the stop concerns its length. He says that Deputy Baranyi's detention of him went well beyond the time period needed to issue a ticket and that no facts were articulated to allow for such a prolonged detention.

{¶ 47} Around 12:40 a.m., Baranyi stopped Thompson for the above-mentioned traffic violations, also suspecting that Thompson might be connected to the burglary that just occurred nearby. One of Deputy Baranyi's first questions to Thompson was where he was coming from and where he was headed. Thompson replied that he was coming from Bathini's house on Heather Hollow—the same street as the burglarized house. Baranyi asked Thompson to come back to his cruiser to talk further and to verify Thompson's story. Baranyi called Bathini, and she told him that while she knew Thompson, she was not at home and that she and Thompson had no plans to see each other that night. This made Deputy Baranyi even more suspicious. Consequently he called his supervisor and told him about the stop and the phone call. Baranyi then searched Thompson's truck and

found a keycard to a hotel room at the America's Best Hotel and an invoice for work done at the burglarized house. Baranyi then talked to Maria Bateman about her encounter with Burns. Bateman said that the man asked her to give him a ride to Tim Horton's in Englewood. Thompson told Baranyi that he was with Burns earlier but had dropped him off. He said that Burns lived at the America's Best Hotel in Englewood. Deputy Baranyi relayed all this information to the other deputies investigating the burglary, telling them that a possible burglary suspect could be at the Tim Horton's in Englewood. When Detective Saunders heard all that was known about the burglary, he asked Deputy Baranyi to ask Thompson if he would come in for an interview, and Thompson agreed. It was 3:19 a.m. when Baranyi brought Thompson to the police station. So Thompson was detained for roughly two-and-a-half hours.

{¶ 48} Baranyi had reasonable, articulable suspicion that Thompson might be involved in the burglary. So Baranyi's detention of Thompson while he verified where Thompson had been was justified. Once Baranyi discovered that Thompson had lied about where he had been, Baranyi's suspicion grew, justifying continued detention while he investigated the burglary. As time passed, Baranyi's suspicion continued to grow as he saw the invoice in Thompson's truck listing the phone number of the burglary call and heard Bateman's story. Additional facts kept coming to light that justified Deputy Baranyi's continued detention of Thompson. We believe this continued detention was reasonable under the evolving circumstances.

*Miranda*

{¶ 49} Deputy Baranyi did not advise Thompson of his *Miranda* rights because Baranyi did not consider Thompson in custody. When Thompson arrived at district

headquarters, Detective Saunders told him that he was not under arrest. Saunders then talked to Thompson for five or ten minutes. Meanwhile, Burns arrived at the station. Saunders left Thompson and went to talk to Burns. After talking with him, Saunders decided to arrest Thompson, because their stories about what had happened that night were contradictory and also because of the items that Deputy Baranyi found in Thompson's truck. Saunders went back to Thompson, told him that he was under arrest, and handcuffed him. Before asking him any further questions, Saunders advised Thompson of his *Miranda* rights.

{¶ 50} Thompson contends that he was subject to custodial interrogation by Deputy Baranyi while he was in the police cruiser. Thompson says that Baranyi never told him that he was free to leave at any time. He notes that the doors on a police cruiser only open from the outside, severely limiting his freedom of movement. Thompson also points out that he was only allowed to exit the police cruiser once to use the restroom and that he was accompanied by two deputy sheriffs and afterwards was immediately put back in the cruiser. Thompson did not testify, so what he actually believed is unknown.

{¶ 51} *Miranda* warnings are required only before a suspect is subjected to custodial interrogation. "The determination whether a custodial interrogation has occurred requires an inquiry into how a reasonable man in the suspect's position would have understood his situation. * * * The ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997). Typically, *Terry* stops do not rise to the level of detention requiring *Miranda* warnings. *State v. Healy*, 2d Dist. Montgomery No. 18232, 2000 WL 1062197, *16 (Aug. 4, 2000), citing *Berkemer v.*

*McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). But warnings are required if a person is subjected to treatment during the detention that renders him "in custody" for practical purposes. *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 18 (2d Dist.).

{¶ 52} It is unclear at what point Thompson is saying he was in custody for *Miranda* purposes. Certainly, he was not in custody immediately. As we have said, "[s]imply asking the motorist in that circumstance to sit in the rear of the police cruiser for a short period of time while answering a few questions or while a citation is issued does not convert the ordinary traffic stop into custodial interrogation." (Citations omitted.) *State v. Barnett*, 2d Dist. Montgomery No. 14019, 1994 WL 567551, *4 (Aug. 31, 1994). *Accord State v. Engle*, 2d Dist. Montgomery No. 25226, 2013-Ohio-1818, ¶ 27 (saying that "instructing an individual to sit in a police cruiser does not convert the traffic stop into a custodial interrogation" and that "[m]any courts have found that this instruction is permissible for purposes of officer safety"). Even if *Miranda* warnings should have been given before they were, Thompson does not cite in his brief—and at oral arguments, could not point to—any specific statements that he made that prejudiced him.

{¶ 53} The third assignment of error is overruled.

### C. *The text messages*

{¶ 54} The fourth assignment of error alleges that the trial court erred by admitting text messages that Thompson sent to Bathini. Thompson contends that the messages are hearsay and were not properly authenticated and were unfairly prejudicial.

{¶ 55} During Bathini's testimony, the State introduced some text messages from her cell phone that were sent between her and Thompson. Defense counsel objected,

and a sidebar was held. The State told the judge that "the text messages show the nature of their relationship, the nature of, you know, the work that he did on the house, how that relationship developed, ended, what his financial situation was." (Trial Tr. 732). Defense counsel explained that his objection was on relevance grounds:

I think that that's several different things, Your Honor. It's—working on the house is one thing. The relationship he had with her romantically is another thing. His marital relationship with his wife was a third thing. The timeline would be a fourth thing. I'm not sure. Each text and each text string relates to a different one. There are some that establish the timeline of when they met and that they knew each other. There are other text strings that would establish what—when he was working and what he was doing for the job. There's another text that may establish that they were having financial problems. There was another text that may, you know, solely deal with their romantic relationship. I think it would depend on what exactly the text is. All of them together aren't relevant to any one thing and would not be relevant to all of the things.

(*Id.*). Noting the defense's continuing objection, the trial court overruled the objection and admitted the messages.

**{¶ 56}** Later during Bathini's testimony, defense counsel told the trial court that "a whole chunk" of text messages were not in the discovery packet from the State. (*Id.* at 749). Counsel appears to be objecting to the admission of the text messages because he did not receive some of them until that day.

**{¶ 57}** Thompson contends that the text messages from Bathini's cell phone were

hearsay, were not properly authenticated, and were unfairly prejudicial. But at trial Thompson did not object to the admission of the messages on any of these grounds. To be sure, he did object, but he did so on the grounds that they were not relevant and that he had not received them in discovery. Thompson acknowledges this but says that counsel entered a continuing objection to admission and that this is sufficient to preserve the issue for review.[3] We disagree. An objection on one ground does not preserve an issue on a ground not raised in the objection. *State v. Barnes*, 10th Dist. Franklin No. 04AP–1133, 2005–Ohio–3279, ¶ 28, citing *State v. Davis*, 1 Ohio St.2d 28, 33, 203 N.E.2d 357 (1964).

{¶ 58} Thompson did not object on hearsay, authentication or prejudice grounds when the error could have been addressed or cured. Although he did object to admission, Thompson did not raise these specific objections until this appeal. Because Thompson failed to object at trial on the specific ground raised here he has forfeited the issue limiting us to plain error analysis. *State v. Tibbetts*, 92 Ohio St.3d 146, 160–61, 749 N.E.2d 226 (2001); Crim.R. 52(B). But even if Thompson had objected to the text messages' admission on the grounds he argues here, we would not find error, plain or otherwise. The text messages are not hearsay. They are party-opponent admissions properly authenticated by Bathini. Nor are the messages unfairly prejudicial.

{¶ 59} A statement is not hearsay if it "is offered against a party and is * * * the party's own statement." Evid.R. 801(D)(2)(a). "Courts have held that photographs of text messages sent from a defendant are not hearsay, instead they qualify as a party-

---

[3] "I'd just renew my objection previously, Your Honor. Other than [that], I have no new objection." (Trial Tr. 903).

opponent admission under Evid.R. 801(D)(2), as long as the statements are properly authenticated." *State v. Davis*, 12th Dist. Madison No. CA2015-05-015, 2016-Ohio-1166, ¶ 21, citing *State v. Bickerstaff*, 11th Dist. Ashtabula No. 2014-A-0054, 2015-Ohio-4014, ¶ 15; and *State v. Shaw*, 2013-Ohio-5292, 4 N.E.3d 406, ¶ 43 (7th Dist.). "[I]n most cases involving electronic print media, i.e., texts, instant messaging, and e-mails, the photographs taken of the print media or the printouts of those conversations are authenticated, introduced, and received into evidence through the testimony of the recipient of the messages." *State v. Roseberry*, 197 Ohio App.3d 256, 2011-Ohio-5921, 967 N.E.2d 233, ¶ 73 (8th Dist.). "Therefore, statements from text messages are properly authenticated and are admissible as a party-opponent admission when the recipient of the messages identifies the messages as coming from the defendant." (Citation omitted.) *Davis* at ¶ 21. Here, Bathini recited the content of the text messages and identified which messages she sent and which were sent by Thompson. The messages were properly admitted through her testimony because she was the recipient, had personal knowledge of their content, and could identify the sender as Thompson.

{¶ 60} Thompson contends that the text messages were unfairly prejudicial because they were misleading. He says that they show only one side of the conversation and says that the only messages presented were those that show him at fault. Thompson says that other messages were not presented that would have shown context.

{¶ 61} Relevant evidence is inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury." Evid.R. 403(A). When determining whether evidence's probative value is "substantially outweighed" by the danger of prejudice, the evidence is viewed in a light

most favorable to the proponent, maximizing its probative value and minimizing any prejudicial effect to the party opposing admission. *State v. Frazier*, 73 Ohio St.3d 323, 333, 652 N.E.2d 1000 (1995); *State v. Dun*, 58 Ohio St.3d 86, 92, 568 N.E.2d 674 (1991).

**{¶ 62}** Bathini specifically testified that the text messages that she discussed at trial were only some of the messages that she received from Thompson. So the jury knew that it was not hearing about every message that Thompson sent. Some messages that were presented show that Thompson was having serious financial problems and needed a lot of money very quickly. Other messages suggest that Thompson and Bathini's relationship ended poorly. Bathini provided context for the messages that were presented by explaining what the conversations were about. We see little danger of unfair prejudice.

**{¶ 63}** The fourth assignment of error is overruled.

D. *Ineffective assistance of counsel*

**{¶ 64}** The fifth assignment of error alleges that defense counsel rendered ineffective assistance.

**{¶ 65}** "The standard for addressing ineffective-assistance-of-counsel claims is two-fold: first, the defendant must show that his counsel's performance was deficient, and second, he must show that his counsel's deficient performance prejudiced him." *State v. Obermiller*, Ohio Sup. Ct. Slip Opinion No. 2016-Ohio-1594, ¶ 83, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "When performing a *Strickland* analysis, we 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Belton*, 2016-Ohio-1581, at ¶ 132, quoting *Strickland* at 689. "Prevailing professional norms dictate that with regard to decisions pertaining to legal proceedings, 'a lawyer must have "full authority to

manage the conduct of the trial." ' " *Obermiller* at ¶ 85, quoting *State v. Pasqualone*, 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270, ¶ 24, quoting *Taylor v. Illinois*, 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)

{¶ 66} Thompson first claims that counsel was deficient for not filing a new motion to suppress or at least asking the newly assigned judge to reconsider the original motion to suppress. But counsel did file a new motion to suppress, on February 10, 2014, asking for a new hearing on the original motion because of the original judge's recusal. Therefore counsel's performance was not deficient in this respect. And, we have already concluded that the trial court was not required to reconsider or grant a new hearing on the re-filed motion to suppress.

{¶ 67} Thompson next claims that counsel was deficient for not properly objecting to the admission of evidence. Thompson does not say what evidence counsel should have objected to. Without identifying the evidence at issue, we cannot determine if counsel's performance was unreasonable.

{¶ 68} Thompson also claims that counsel was deficient for not filing a motion to continue jury deliberations. This, the second, trial lasted five days. The jury began its deliberation around 3:00 p.m. on Friday and returned a unanimous guilty verdict by 4:00 p.m. In contrast, after the first trial the jury deliberated for several hours. Thompson says that the difference in deliberation time shows that the second jury did not spend enough time considering the evidence. Counsel, says Thompson, should have moved to continue deliberations until the next week.

{¶ 69} As we have said concerning the length of jury deliberations:

" '[T]he verdict should be the result of sound judgment, dispassionate

consideration, and conscientions [sic] reflection * * *.' " [*Val Decker Packing Co. v. Treon*, 88 Ohio App. 479, 489, 97 N.E.2d 696 (2d Dist.1950)], quoting 64 Corpus Juris, Section 808, at 1019. "Brief deliberation, by itself, does not show that the jury failed to give full, conscientious or impartial consideration to the evidence." *Wilburn v. Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir.1999). "There is no statutory provision prescribing the length of time a jury shall deliberate before reaching a verdict." *Val Decker* at 489, 97 N.E.2d 696. " '[W]here the law does not positively prescribe the length of time a jury shall consider their verdict, they may render a valid verdict without retiring, or on very brief deliberation after retiring * * *.' " *Val Decker* at 489, 97 N.E.2d 696, quoting 64 Corpus Juris, Section 808, at 1019.

(Citations omitted.) *State v. Brown*, 2d Dist. Champaign No. 2015-CA-21, 2016-Ohio-4573, ¶ 9. Still, " ' "the trial court may, in its discretion, cause the jury to reconsider the case if their decision is so hasty as to indicate a flippant disregard of their duties." ' " (Citation omitted.) *Id.* at ¶ 7, quoting *Val Decker* at 489, quoting 64 Corpus Juris, Section 808, at 1019.

{¶ 70} Merely because the jury in the first trial took longer to deliberate than the jury in the second trial does not mean that the jury failed to properly consider the evidence. The first trial ended in a hung jury, which suggests that the jury spent a good deal of time not only considering the evidence but also trying to hammer out their different views of it. The second trial ended with a unanimous verdict, and nothing in the record suggests that this verdict was reached with particular difficulty. We see nothing that would overcome the strong presumption that not moving to continue deliberations was reasonable.

**{¶ 71}** Thompson claims that counsel did not conduct voir dire effectively, leading to the selection of biased jurors. Thompson says that he told counsel that he and a defense witness knew one of the prospective jurors from high school. But counsel made a statement on the record that they did not attend the same school. Also, says Thompson, counsel was advised by another defense witness that he was engaged in an intimate relationship with a juror in December of 2012. Thompson says that counsel failed to question either juror as to their ability to remain fair and impartial.

**{¶ 72}** Thompson's claim about the first juror is based on information that the juror gave the trial court after Brandon Thompson (Thompson's brother) testified, which the court then brought to the attention of the parties before it instructed the jury. The juror told the court that she "vaguely recognized" Brandon. (Trial Tr. 1102). According to the court, she said that "[t]hey went to school at the same school. I think they were a couple years apart. She kind of recognized him, not right away, said, really had nothing to do with anything. She didn't know him well. I don't even know if she knew him at all." (*Id.* at 1102-1103). Counsel spoke with Brandon, and he said that he "recognized the juror in the front row. [He] went to school with her." (*Id.* at 1103). Counsel also spoke with Thompson, who said that he "did not go to that school and did not recognize her at all, and never met her." (*Id.*). It was the trial court's understanding that "the juror was just telling us because, you know, we tell them to tell us anything, but it wouldn't have any impact." (*Id.*). Defense counsel agreed: "It's my understanding they didn't have a relationship, that it wouldn't affect anything * * *." (*Id.*). The juror did not have a relationship with either Thompson or his brother, only vaguely recognized Brandon Thompson from school, and said that her

recognition of him did not really matter. We see no good reason to think that the juror was not fair and impartial. As to Thompson's claim about the second juror, that a defense witness had been in a romantic relationship with the juror, there is simply no evidence of this in the record. Therefore we see nothing deficient about counsel's performance with respect to these two prospective jurors.

{¶ 73} Thompson claims that counsel was deficient for not objecting to false statements made by the State in its closing arguments. The prosecutor told the jury that Thompson "went back to the headquarters and gave inconsistent statements but admitted that when the police shined their light, he ducked down." (Trial Tr. 1085). Thompson asserts that Detective Saunders, to whom he made the admission, never said this. Thompson is incorrect. Saunders testified that Thompson admitted lying back: "* * * He [Thompson] stated that he[] remembered the deputies pulling onto the street and remembered the deputy shining the light in the car but stated that the deputy must not have saw him, and that [he] kind of laid back in the car." (*Id.* at 834). Counsel cannot be faulted for not objecting to the prosecutor's reasonable summary of the evidence.

{¶ 74} Thompson claims that counsel was deficient for refusing to question defense and State witnesses. But the record shows that counsel questioned every witness presented at trial. Thompson does not explain this accusation any further.

{¶ 75} Thompson also claims that counsel should have called Jeff Molton, Burns's supervisor at Tim Horton's, to testify. The record shows that counsel subpoenaed Molton and intended to call him, but Molton was not in the courtroom when he was supposed to be. The record does not reveal why counsel decided not to call Molton. " 'Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will

not be second-guessed by a reviewing court.' " *Belton*, 2016-Ohio-1581, at ¶ 149, quoting *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749 (2001). We see no good reason to second-guess counsel's decision in this case. Also, the record does not reveal what Molton's testimony would have been. So we cannot say whether Thompson was prejudiced by not having Molton testify.

**{¶ 76}** Thompson's last claim of deficient performance is that counsel made a critical tactical error by not filing a motion to admit the alibi of his co-conspirator, which would have contradicted the State's evidence. Thompson does not identify this co-conspirator although we can assume he means Burns. But Burns admitted to committing the burglary, an admission which contradicts an alibi. If at some time he had filed a notice of alibi in his case, it is not in our record. Moreover, Burns was thoroughly cross examined about the various denials he had made to the detective before admitting his presence at, and involvement in the burglary.

**{¶ 77}** Thompson fails to show that defense counsel's performance was deficient. So the ineffective-assistance claim must fail.

**{¶ 78}** The fifth assignment of error is overruled.

### E. *Punishment for going to trial*

**{¶ 79}** The sixth assignment of error alleges that the trial judge punished Thompson by enhancing his sentence for exercising his right to a jury trial.

**{¶ 80}** "It is beyond dispute that a defendant cannot be punished for refusing to plead guilty and exercising his right to a trial. 'Accordingly, when imposing a sentence, a trial court may not be influenced by the fact that a defendant exercised his right to put the government to its proof rather than pleading guilty.' Where the record creates an inference

that a defendant's sentence was enhanced because he elected to put the government to its proof, we have looked for additional evidence dispelling the inference and unequivocally explaining the trial court's sentencing decision." (Citations omitted.) *State v. Anderson*, 2d Dist. Montgomery No. 26525, 2016-Ohio-135, ¶ 7, quoting *State v. Blanton*, 2d Dist. Montgomery No. 18923, 2002 WL 538869, *2-3 (April 12, 2002).

**{¶ 81}** Thompson says that the trial judge made angry statements that were meant to deter him from proceeding to trial. The judge was, according to Thompson, irritated because he was not convicted in the first trial and by the circumstances leading to the hung jury. The judge made a comment referring to PTSD because of the first trial. Thompson asserts that the judge also said that she was convinced that Thompson had interfered with the jury. Lastly, Thompson says that the judge's attitude toward him tended to manipulate the jury into finding him guilty.

**{¶ 82}** The statements that Thompson cites were made during voir dire and at the end of the trial. The statements made during voir dire occurred at a sidebar after the State had finished questioning the prospective jurors. The judge asked defense counsel how long his questioning would take:

THE COURT: How long do you think you'll be?

MR. STATON [Defense counsel]: Not as long as that.

MS. AMRHEIN [for the State]: Sorry.

MR. STATON: That's all right. You got more stuff to do.

THE COURT: No, no, that's fine. Half hour, 45 minutes?

MR. STATON: Yeah, something like that.

THE COURT: Okay. We'll take 15 minutes. I know I don't have to say this,

but again remember, I've got my PTSD from the last trial.

MR. STATON: No twitching.

THE COURT: Make sure your client and his mom do not mingle with the prospective jurors.

MR. STATON: Oh, certainly.

THE COURT: Okay. I—

MR. STATON: I will certainly do that.

THE COURT: I have no idea like I said, last time they did not have a whole lot of restrictions on them so I'm not implying anything about them. I just want to be careful.

MR. STATON: Sure.

THE COURT: Okay.

(Trial Tr. 180-181). The end-of-trial statements were made right after the jury was discharged:

THE COURT: * * * The Court has reviewed the verdict entry. It is filled in ink, signed by all 12 jurors and the Court orders that the judicial assistant file it forthwith.

Okay. You can be seated.

At this time, I am going to revoke the Defendant's bond, taking him into custody and put this on for sentencing on Wednesday at 11:00, okay?

* * *

THE COURT: Any[thing] further, Defense counsel?

MR. STATON: Your Honor, we would ask the Court consider to continuing

bond until sentencing. Our—

THE COURT: No.

MR. STATON: —client is at a low flight risk in this matter. He hasn't been out in years since this—

THE COURT: He's been out for a long time. He has a number of previous convictions. I don't think that would be appropriate. We'll do the sentencing on Wednesday.

THE DEFENDANT: I've got my kids, and work, and all that stuff. I've got to get back.

UNIDENTIFIED SPEAKER: It's over. Let's go.

THE DEFENDANT: [F***].

THE COURT: For attorneys, I'm going to go talk to the lawyers. I don't know if any of you want to come back.

THE DEFENDANT: Fine. I don't do—

THE COURT: I will talk to—

THE DEFENDANT: —it to you.

THE COURT: —them first. Ask if you want to come—

THE DEFENDANT: I didn't do it to you.

THE COURT: —if you do, fine. If you—

THE DEFENDANT: I don't care what you—

THE COURT: —don't, that's fine, too.

THE DEFENDANT: —think.

THE COURT: And I don't know if they're going to want to talk to you or not.

(*Id.* at 1108-1109).

**{¶ 83}** We do not believe that any of these statements come close to creating an inference that Thompson's sentence was enhanced because he exercised his right to a trial. The judge never suggested that she thought that Thompson had interfered with the jury. And the jury could not have been affected by any of the statements because the jury did not hear any of them.

**{¶ 84}** The sixth assignment of error is overruled.

### III. Conclusion

**{¶ 85}** We have overruled all of the assignments of error. Therefore the judgment of conviction is affirmed.

. . . . . . . . . . . .

FAIN, J., and WELBAUM, J., concur.

Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
Antony A. Abboud
Hon. Barbara P. Gorman
Andrew T. French